**UNITED STATES DISTRICT COURT**

**DISTRICT OF NEVADA**

| | |
|---|---|
| JUAN M. ALCARAZ, | Case No.: 2:13-cv-00818-JCM-BNW |
| Petitioner, | **Order** |
| v. | |
| BRIAN WILLIAMS, et al., | |
| Respondents. | |

Juan M. Alcaraz, a Nevada prisoner, filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. This court denies Alcaraz's habeas petition, denies him a certificate of appealability, and directs the clerk of the court to enter judgment accordingly.

**I.      BACKGROUND**

Alcaraz's convictions are the result of events that occurred in Clark County, Nevada on or about July 22, 2005. (ECF No. 12-9 at 2.) At approximately 11:00 p.m. on July 22, 2005, a surveillance videotape showed Alcaraz and a group of his companions walk past Roberto Rodriguez on the sidewalk outside of a market. (ECF No. 13 at 36.) While passing each other, Alcaraz and Rodriguez shared "a lot of hostile eye contact," and "it appear[ed] something must have been said" because Alcaraz and his companions "all turn around at the same time." (*Id.* at 37,

48.) Rodriguez then "placed his can of beer on a window ledge," while Alcaraz walked back towards him. (*Id.* at 37-38.) When the two individuals were "standing toe to toe," Rodriguez punched Alcaraz. (*Id.* at 38.) Alcaraz then placed his cigarette in his mouth, pulled out a semiautomatic handgun, manipulated the handgun in some way, and shot Rodriguez seven times, killing him. (*Id.* at 38-39, 52, 63.)

Following the shooting, Alcaraz ran to a nearby apartment building, hid his handgun in a dryer in a laundry room, and approached a man who was sitting outside of the apartment building to ask for a change of clothes. (*Id.* at 12; ECF No. 12-23 at 55-56.) Law enforcement arrived approximately a half an hour later and arrested Alcaraz, who initially gave them an incorrect name. (ECF No. 13 at 14; ECF No. 12-24 at 2-7.) Alcaraz also initially denied involvement in the shooting, but after being shown the surveillance videotape, Alcaraz "snickered and dropped his head." (ECF No. 13 at 41-42.) When law enforcement asked Alcaraz to talk, Alcaraz responded, "[t]alk. What for? You fuckin' have everything." (*Id.* at 42.) Alcaraz then confessed during his formal law enforcement interview, indicating "that the victim disrespected him" and "disrespected [his] neighborhood." (*Id.* at 70, 72.)

Alcaraz was charged with open murder and, following a jury trial, was found guilty of second-degree murder with the use of a deadly weapon and carrying a concealed firearm. (ECF No. 13-3.) Alcaraz was sentenced to 10 years to life for the second-degree murder conviction plus a consecutive term of 10 years to life for the deadly weapon enhancement and 24 to 60 months for the concealed firearm conviction. (ECF No. 13-8 at 3.) Alcaraz appealed, and the Nevada Supreme Court affirmed on March 10, 2008. (ECF No. 13-25.) Remittitur issued on April 4, 2008. (ECF No. 13-27.)

Alcaraz filed a pro se state habeas petition on January 13, 2009. (ECF No. 14-1.) The state district court denied the petition on February 20, 2009. (ECF No. 14-7.) Alcaraz appealed, and the Nevada Supreme Court reversed and remanded, determining that the state district court should have appointed counsel for Alcaraz and conducted an evidentiary hearing. (ECF No. 14-16.) Alcaraz filed a counseled supplemental petition on February 1, 2011. (ECF No. 14-20.) Following an evidentiary hearing, the state district court denied Alcaraz's supplemental petition on June 22, 2011. (ECF No. 15-12.) Alcaraz appealed again, and the Nevada Supreme Court affirmed on May 10, 2012. (ECF No. 16-15.) Remittitur issued on June 6, 2012. (ECF No. 16-17.)

Alcaraz's pro se federal habeas petition was filed on May 16, 2014. (ECF No. 8.) Respondents moved to dismiss the petition on June 30, 2014. (ECF No. 10.) This court granted the motion, dismissing the petition with prejudice because it was untimely. (ECF No. 23.) Alcaraz appealed, and the United States Court of Appeal for the Ninth Circuit reversed and remanded, determining that Alcaraz was entitled to equitable tolling to excuse his late filing. (ECF No. 35.) Following the remand, Alcaraz filed a counseled first amended petition on April 9, 2018. (ECF No. 47.) Respondents moved to dismiss the first amended petition on June 8, 2018, arguing that it was not properly verified, untimely, and unexhausted, in part. (ECF No. 49.) This court granted the motion in part, dismissing grounds 3 and 5 without prejudice; finding that ground 2 was unexhausted; determining that grounds 1(2), 1(3), 1(4), 1(5), 1(6), and 1(7) were technically exhausted but procedurally defaulted; dismissing ground 6 as non-cognizable; and finding that ground 7 would proceed to the extent of any procedurally viable claims. (ECF No. 59.) Alcaraz filed a second amended petition deleting ground 2 on May 28, 2019. (ECF No. 67.) Respondents answered the remaining claims in Alcaraz's second amended petition on September 3, 2019, and Alcaraz replied on November 22, 2019. (ECF Nos. 73, 80.)

In his remaining grounds for relief, Alcaraz raises the following violations of his federal constitutional rights:

1(1). His trial counsel improperly introduced bad act evidence
1(2). His trial counsel failed to object to the state improperly commenting on his right to remain silent
1(3). His trial counsel failed to object to the state improperly advising the jurors to test the evidence themselves
1(4). His trial counsel failed to object to the state improperly shifting the burden of proof
1(5). His trial counsel failed to investigate and present evidence showing that Rodriguez was the initial aggressor
1(6). His trial counsel rushed through the proceedings
1(7). His trial counsel failed to file a motion to suppress his confession due to his impaired condition at the time of his law enforcement interview and to present evidence showing that he lacked intent due to his impaired condition
4. The state improperly commented that it would be a "freebie" to convict Alcaraz of manslaughter
7. There were cumulative errors

(ECF No. 67.)

## II.    STANDARD OF REVIEW

28 U.S.C. § 2254(d) sets forth the standard of review generally applicable in habeas corpus cases under the Antiterrorism and Effective Death Penalty Act ("AEDPA"):

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law

4

set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous. The state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409-10) (internal citation omitted).

The Supreme Court has instructed that "[a] state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court has stated "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* at 102 (citing *Lockyer*, 538 U.S. at 75); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the standard as a "difficult to meet" and "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt" (internal quotation marks and citations omitted)).

## III.   DISCUSSION

### A.    Ground 1

In ground 1, Alcaraz alleges that his trial counsel was ineffective. (*See* ECF No. 67 at 15.) In *Strickland*, the Supreme Court propounded a two-prong test for analysis of claims of ineffective

assistance of counsel requiring the petitioner to demonstrate (1) that the attorney's "representation fell below an objective standard of reasonableness," and (2) that the attorney's deficient performance prejudiced the defendant such that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A court considering a claim of ineffective assistance of counsel must apply a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689. The petitioner's burden is to show "that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Additionally, to establish prejudice under *Strickland*, it is not enough for the habeas petitioner "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, the errors must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687.

Where a state district court previously adjudicated the claim of ineffective assistance of counsel under *Strickland*, establishing that the decision was unreasonable is especially difficult. *See Harrington*, 562 U.S. at 104–05. In *Harrington*, the United States Supreme Court clarified that *Strickland* and § 2254(d) are each highly deferential, and when the two apply in tandem, review is doubly so. *Id.* at 105; *see also Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (internal quotation marks omitted) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as doubly deferential."). The Supreme Court further clarified that, "[w]hen § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105.

### 1. Ground 1(1)

In ground 1(1), Alcaraz alleges that his trial counsel introduced bad act testimony at his trial, namely testimony concerning gangs and the fact that Alcaraz was in a gang. (ECF No. 67 at 17.) Alcaraz contends that the jury likely convicted him because he belonged to a gang and not based on the evidence in the case. (*Id.* at 21.) In affirming the denial of Alcaraz's state habeas petition, the Nevada Supreme Court held:

> Alcaraz argues that the district court erred by denying his claim that trial counsel was ineffective for eliciting highly prejudicial gang evidence during trial. To prove ineffective assistance of counsel, a petitioner must demonstrate that his trial counsel's performance was deficient and that the petitioner was prejudiced by his counsel's performance. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Means v. State*, 120 Nev. 1001, 1011, 103 P.3d 25, 31-32 (2004) (explaining the *Strickland* test). When reviewing the district court's resolution of an ineffective-assistance claim, we give deference to the court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).
>
> Here, the district court conducted an evidentiary hearing, during which defense counsel testified that he made a strategic decision to elicit testimony that Alcaraz was in a gang that controlled the neighborhood where the shooting took place in order to provide context for Alcaraz's state of mind and his statements and behavior surrounding the shooting. The district court found that counsel's strategy was "risky" but that counsel had "very little to work with" given that the jury was shown a videotape of the shooting in which gang involvement was apparent, and Alcaraz could not show prejudice because he was found guilty of second-degree murder rather than first-degree murder. We conclude that the district court's findings were based upon substantial evidence and were not clearly wrong. *See id.* As described by this court on direct appeal, the videotape of the incident showed that "the victim 'punched' Alcaraz, but Alcaraz did not appear to be injured. Alcaraz then stepped back from the victim, inhaled on his cigarette, pulled a handgun from his waistband, and shot the victim six times. Alcaraz then fled the scene and disposed of his clothes and the weapon." *Alcaraz v. State*, Docket No. 48642 (Order of Affirmance, March 10, 2008, at 2). In light of the videotape, Alcaraz could not demonstrate that there was a reasonable probability of a different outcome at trial had counsel not elicited testimony about gang involvement. *See Strickland*, 466 U.S. at 687-88; *Means*, 120 Nev. at 1012, 103 P.3d at 33 (petitioner bears the burden of proving ineffective assistance). Therefore, we conclude that the district court did not err in denying this claim.

(ECF No. 16-15 at 2-3.) The Nevada Supreme Court's rejection of Alcaraz's *Strickland* claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

During Alcaraz's trial, his trial counsel discussed gangs and his gang affiliation on numerous occasions with various witnesses. First, during his cross-examination of Cassandra Lopez, a cashier and assistant manager at the Green Valley Grocery, which was located near the shooting, Alcaraz's trial counsel asked whether the surrounding neighborhood was dangerous. (ECF No. 12-22 at 59.) Second, after the state asked Jose Cotila, a friend of the victim, whether the "neighborhood has gang problems," Alcaraz's trial counsel asked Cotila if it "appear[ed] obvious . . . that [Alcaraz and his companions] were with a gang." (ECF No. 12-24 at 18.) Third, Officer Sasha Kaster testified on direct examination that the area of the shooting was a high crime area. (ECF No. 13 at 9.) Kaster explained that "99% of the time [neighborhood residents are] very afraid to say anything just due to retaliation" because "[i]t's a very high-ridden gang population area." (*Id.*) Alcaraz's trial counsel later asked Kaster about a gang member being in fear of retaliation, to which Kaster explained: "18th Street gang is predominately that area, and I don't know, quite honestly, that they fear retaliation from anybody in that neighborhood. They own that neighborhood." (*Id.* at 15-16.) Alcaraz's trial counsel followed up by asking if "a gang member . . . could fear retaliation if they're involved in some . . . activity" and if "it wouldn't be necessarily unusual for a gang member to try and hide or change their appearance to kind of prevent retaliation." (*Id.* at 16.) Fourth, Alcaraz's trial counsel asked Detective Mark McNett whether it appeared that Alcaraz and his companions were gang members and about gang members' social accessories and clothing. (ECF No. 13 at 46-47.)

Finally, Detective Michael Wallace testified extensively on direct and cross-examination about gangs. Detective Wallace testified that the area of the shooting was a high crime area infiltrated by gangs, specifically "the 18th Street criminal street gang." (ECF No. 13 at 61-62.) Wallace gave some background on the gang and explained that some witnesses can be fearful of identifying gang members due to fear of retribution. (*Id.* at 62.) Wallace also explained that "what usually happens is gangs are like, like a pack of wolves or like a swarming insect. If one gang member gets involved in something they usually all start to attack." (*Id.* at 73.) And after the state asked, "if there was something that was said to [Alcaraz] by . . . Rodriguez, and [Alcaraz] did nothing, what would result," Detective Wallace responded:

> The gang subculture in 18th Streeter, which is a very complex gang, they all have bylaws or rules. They may not be written down, but everybody kind of knows the loose structure of the rules and there – it's just like in any facet of society, any type of job, any type of group you belong to, the rules have an enforcement, basically a person that enforces the rules, and those are usually the gang leaders and the shot callers, and if you're confronted with somebody that disrespects your neighborhood, or disrespects you, and you don't take affirmative action to defend it, they could hold you in what they call - - they could keep you in check or hold court on you, which is basically discipline for your failure to represent your neighborhood and act. . . .

> If you stand - - if you fail to act, you get disciplined. But if you do act, and you take the challenge, and you confront the challenge, and you represent your neighborhood, you gain status within your subculture and just like how we go to work, and we try to do our best in order to maybe get a promotion, and so forth, in the gang subculture by acting and representing your neighborhood and standing up for your gang you gain status and in this particular instance this would have elevated his status.

(*Id.* at 73-74.) Alcaraz's trial counsel then cross-examined Detective Wallace about the demographic of gangs, the fact that gangs "start [recruiting] around 12, 13 years of age," and the level of respect that gangs demand. (ECF No. 13-1 at 2-4.)

In addition to this gang evidence, Alcaraz's trial counsel also discussed gangs in his closing argument, explaining, in part:

> if you're Mr. Rodriguez, you see these four individuals, clearly gang members, in that neighborhood. You're aware of the situation, and you take the steps in which you do, you put down your beer, call him out, make him come back, and then you do what in front of everybody- - you punch him? Did Mr. Rodriguez know something that nobody else knew? I mean, if he punches you, are you thinking why would he punch me in front of my homies? How could he punch me here? This guy knows something I don't know. This guy might be armed. This guy might have a knife, a gun, or anything on him. Now, as it turns out, he doesn't, but you don't have to wait and find that out, and that activity by Mr. Rodriguez is so bizarre in light of those circumstances.[1]

(ECF No. 13-1 at 33-34.)

Later, at the post-conviction evidentiary hearing, Alcaraz's trial counsel testified that he "embrac[ed] the gang nature[,] the high crime environment," and the gang behaviors and subcultures at Alcaraz's trial. (ECF No. 15-8 at 12-13.) It was apparent from the surveillance videotape and other evidence that "this case had gang involvement," so Alcaraz's trial counsel had the option of "either confront[ing] it and discuss[ing] it" through the detectives' testimony or "pretend[ing] it's not there" and objecting to any reference of gangs.[2] (*Id.* at 14-15.) Alcaraz's trial counsel opted for the former option, "embrac[ing] what appears to . . . be the obvious," in order to explain Alcaraz's state of mind—which was the deciding factor between first-degree murder, second-degree murder, involuntary manslaughter, and self-defense—and to explain "how that lifestyle, how that involvement, how these relationships played a role in the shooting." (*Id.* at 15,

---

[1] Alcaraz acknowledged and approved of the way his trial counsel "was going to approach" the closing argument. (ECF No. 13-1 at 57.)

[2] And according to Alcaraz's trial counsel, any objection would not have been successful because the state "certainly would have been entitled to bring up any number [of] things about him, specifically, as it related to that incident and what he was wearing and that it was gang involved and that they knew it." (ECF No. 15-8 at 13.)

24.) Indeed, Alcaraz told the detectives during his law enforcement interview that he "was pissed off and [Rodriguez] disrespected [him] and [Rodriguez] disrespected [his] neighborhood," and those comments would not have been able to be explained without "embrac[ing] the whole gang thing in the first place."[3] (*Id.* at 21.) Furthermore, the latter option of "not address[ing] it, in [Alcaraz's trial counsel's] opinion, would have just left an undercurrent of misunderstanding and fear with the jurors." (*Id.* at 29.) Additionally, Alcaraz's gang involvement helped his self-defense argument: "This was a gang area and [Rodriguez] was taking them on, which means not only was he not scared, he was aggressive and that made him potentially more dangerous, which would have been the only way to explain how [Alcaraz] would have been justified in shooting him." (*Id.* at 22.)

The Nevada Supreme Court reasonably concluded that the state district court did not error in finding Alcaraz's trial counsel not deficient. *Strickland*, 466 U.S. at 688. Although discussing the fact that Alcaraz was in a gang may have portrayed him in an undesirable light, Alcaraz's trial counsel strategically embraced his gang membership for several sensible reasons: it allowed him to explain Alcaraz's law enforcement interview statements about disrespect, it allowed him to argue self-defense based on Rodriguez's brazen behavior around a group of gang members, and it allowed him to explain Alcaraz's fear of retribution from the gang if he did not act in the face of Alcaraz's actions. Moreover, there was numerous witnesses who testified that it was obvious from the surveillance videotape that Alcaraz was a gang member, so it would have been futile to try to circumvent the gang issue. Thus, Alcaraz's trial counsel acted strategically and rationally in eliciting testimony about gangs, not objecting to the state's elicitation of testimony about gangs,

---

[3] Alcaraz's trial counsel explained that he used Alcaraz's statements to law enforcement to argue that if Alcaraz did not act in the face of Rodriguez's alleged disrespect, he would have faced retribution from the gang. (ECF No. 15-8 at 23.)

and arguing about gangs in his closing argument. *See Strickland*, 466 U.S. at 690 ("[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."); *see also Correll v. Ryan*, 539 F.3d 938, 948 (9th Cir. 2008) ("[U]nder *Strickland*, we must defer to trial counsel's strategic decisions.").

Further, the Nevada Supreme Court also reasonably concluded that the state district court did not error in finding that Alcaraz could not demonstrate prejudice. *Strickland*, 466 U.S. at 694. As the Nevada Supreme Court reasonably noted, the surveillance videotape provided substantial evidence of Alcaraz's guilt, such that he cannot demonstrate that the outcome of his trial would have been different if his trial counsel had tried to shield, rather than embrace, his gang affiliation. This conclusion is supported by the fact that the jury convicted Alcaraz of second-degree murder even though the state argued that the evidence supported first-degree murder. And contrary to Alcaraz's contention that the jury likely convicted him because he belonged to a gang, the jury was specifically instructed that "evidence [implying that the defendant is a member of a particular gang] was not received and may not be considered by you to prove that the defendant is a person of bad character." (ECF No. 13-2 at 31.)

Because the Nevada Supreme Court reasonably denied Alcaraz's ineffective-assistance-of-trial-counsel claim, Alcaraz is denied federal habeas relief for ground 1(1).

### 2. Ground 1(2), 1(3), 1(4), 1(5), 1(6), and 1(7)

This court previously determined that grounds 1(2), 1(3), 1(4), 1(5), 1(6), and 1(7) were technically exhausted but procedurally defaulted. (ECF No. 59 at 8.) Alcaraz previously argued that he could demonstrate cause and prejudice under *Martinez v. Ryan*, 566 U.S. 1 (2012) to excuse the defaults because his post-conviction counsel was ineffective. (ECF No. 52 at 2, 15.) This court

deferred consideration of Alcaraz's cause and prejudice argument under *Martinez* until the time of merits consideration. (ECF No. 59 at 8.)

In *Martinez*, the Supreme Court ruled that "when a State requires a prisoner to raise an ineffective-assistance-of-trial counsel claim in a collateral proceeding, a prisoner may establish cause for a default of an ineffective-assistance claim" if "the state courts did not appoint counsel in the initial-review collateral proceeding" or "where appointed counsel in the initial-review collateral proceeding . . . was ineffective." 566 U.S. at 14. "To overcome the default, a prisoner must also demonstrate that the underlying ineffective-assistance-of-trial-counsel claim is a substantial one, which is to say that the prisoner must demonstrate that the claim has some merit." *Id.* As discussed below, this court now determines that grounds 1(2), 1(3), 1(4), 1(5), 1(6), and 1(7) are not substantial.

### a. Ground 1(2)

In ground 1(2), Alcaraz alleges that his trial counsel failed to object to the state's improper closing argument regarding his election to remain silent.[4] (ECF No. 67 at 22-23.) Respondents argue that the state's statement was based upon the evidence presented at trial. (ECF No. 73 at 28.)

During the state's closing argument, it explained:

If this truly was a case of self defense, you would rest assure that the defense attorney would have been harping on that a lot more because the defendant would have even offered that as an excuse when he got caught. Not one time in that statement that you heard - - that second statement - - did he say: I had to do it in self defense 'cause I was worried. Not one time. And you know, just by listening to his statement, there was a lot more that he could have offered by telling Detective McNett or Detective Wallace, but he didn't offer that. No. He just kind of sat there quietly.

---

[4] Alcaraz also alleges that his appellate counsel failed to raise this same issue in his direct appeal. (ECF No. 67 at 24.) This claim is not preserved under *Martinez* and, as such, lacks merit. *See Davila v. Davis*, 137 S.Ct. 2058 (2017) (declining to extend *Martinez*'s exception to appellate-ineffectiveness claims).

(ECF No. 13-1 at 47.) The state also commented:

> But let's take common sense and logic again. If this was done in self defense he would have stayed put right there waiting for police and say: Oh, my God. This guy - - I think he was gonna kill me. He said he was gonna kill me. It looked like he had a weapon. I had to kill him.

(*Id.* at 55.)

It is accurate, as Alcaraz notes, that the government may not comment on a defendant's post-arrest silence at trial. *See Griffin v. California*, 380 U.S. 609, 614 (1965); *Doyle v. Ohio*, 426 U.S. 610, 618 (1976) ("'[I]t it does not comport with due process to permit the prosecution during the trial to call attention to [a defendant's] silence at the time of arrest and to insist that because he did not speak about the facts of the case at that time, as he was told he need not do, an unfavorable inference might be drawn as to the truth of his trial testimony.'"). However, contrary to Alcaraz's assertions, the state's foregoing comments did not touch upon his post-arrest silence—indeed, Alcaraz was not silent following his arrest. Detective Wallace testified that Alcaraz was read his *Miranda* rights and indicated "that he would be willing to talk." (ECF No. 13 at 66.) Alcaraz then confessed to law enforcement, explaining that Rodriguez "disrespected him, . . . disrespected [his] neighborhood." (*Id.* at 70.) Given these facts, it is clear that the state was merely appropriately commenting on the fact that Alcaraz admitted to killing Rodriguez because he was disrespected— not because he was acting in self-defense. *See Fernandez v. State*, 81 Nev. 276, 279, 402 P.2d 38, 40 (1965) (explaining that a "defendant's failure to testify cannot directly or indirectly be the subject of comment by the prosecution, but a reference to evidence or testimony that stands uncontradicted is acceptable"); *United States v. Mende*, 43 F.3d 1298, 1301 (9th Cir. 1995) ("There is a distinction between a comment on the defense's failure to present exculpatory evidence as opposed to a comment on the defendant's failure to testify."); *Menendez v. Terhune*, 422 F.3d

1012, 1034 (9th Cir. 2005) ("A prosecutor may, consistent with due process, ask a jury to convict based on the defendant's failure to present evidence supporting the defense theory."). Accordingly, because Alcaraz's trial counsel was not deficient for not objecting to the state's closing argument, *Strickland*, 466 U.S. at 688, ground 1(2) is not substantial and is denied as being procedurally defaulted. *See Martinez*, 566 U.S. at 14.

**b.      Ground 1(3)**

In ground 1(3), Alcaraz alleges that his trial counsel failed to object to the state's improper closing argument suggesting that the jurors conduct their own testing of the evidence outside of the deliberation process. (ECF No. 67 at 24.)

James Krylo, a firearms and tool mark examiner, testified at Alcaraz's trial that the "pound pressure on the trigger" of the handgun used by Alcaraz to shoot Rodriguez was "6-1/4 and 6-1/2 pounds." (ECF No. 13 at 25.) Later, during the state's closing argument, it commented on the trigger pressure as follows:

> He wanted to kill him. Six times did he have to pull this trigger, that we can account for, possibly a seventh time, but we know we found a total of six expended casings. Six-and-a-half pounds of pressure is required to pull this trigger. Take six pounds of flour or sugar that you buy at a grocery store, put it in one of those Albertson's plastic bags, and hold it up with one finger, and then try to move it up. Six times does he have to pull that weight. That's a lot of pressure if you really think about it, and that's a lot of thought process to do as you aim this weapon to another living, breathing human being. That's willfulness, that's deliberation, that's premeditation in this particular case.

(ECF No. 13-1 at 54-55.)

While "[j]urors have a duty to consider only the evidence which is presented to them in open court," *Bayramoglu v. Estelle*, 806 F.2d 880, 887 (9th Cir. 1986) (explaining that "[t]he ultimate question" to be asked if "a juror has breached this duty by infecting the deliberations with extrinsic material," is "whether it can be concluded beyond a reasonable doubt that extrinsic

evidence did not contribute to the verdict"), the state here only rhetorically requested that the jurors put flour or sugar into a grocery bag in order to impress upon them the pressure required to pull the trigger of Alcaraz's handgun. It did not request that such a demonstration actually take place. Moreover, the state is permitted to comment on the evidence presented at trial and make reasonable inferences that could be drawn from that evidence. *See Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000). Here, the state comments merely put Krylo's testimony into context. Therefore, Alcaraz's trial counsel was not deficient for not objecting to this comment. *Strickland*, 466 U.S. at 688.

And even if Alcaraz's trial counsel was deficient for perhaps not being overly cautious and objecting to verify that no juror believed the state's comment to be a literal request, Alcaraz fails to demonstrate prejudice. *Strickland*, 466 U.S. at 694. First, the jurors were instructed several times that they were limited to considering only the evidence presented at trial. (*See* ECF No. 12-22 at 22 (opening instruction to the jury prior to the presentation of evidence that they were "not allowed to consider anything outside the courtroom" which prohibited them from "try[ing] to do [their] own investigation") and ECF No. 13-2 at 35 (closing instruction to the jury following the presentation of evidence that they could "consider only the evidence in the case in reaching a verdict").) And second, more importantly, the jury started deliberations almost immediately after this comment was made, coming to a verdict a mere hour later. (*See* ECF No. 13-1 at 54-55, 58.) Thus, there was no time for the jury to have conducted an experiment on their own, thereby affecting the verdict. Because Alcaraz's ineffective-assistance-of-trial-counsel argument lacks merit, ground 1(3) is not substantial and is denied as being procedurally defaulted. *See Martinez*, 566 U.S. at 14.

16

### c.    Ground 1(4)

In ground 1(4), Alcaraz alleges that his trial counsel failed to object to the state's improper closing argument that shifted the burden of proof. (ECF No. 67 at 25.) Specifically, Alcaraz alleges that the state improperly stated that he needed to prove that Rodriguez was drunk, aggressive, brazen, and in a bad mood. (*Id.* at 26.)

During Alcaraz's trial counsel's closing argument, he noted that Rodriguez had been drinking, and "[h]e probably got a little more violent than he normally would[, h]e probably was a little braver than he normally would be, but he still did something that initiated this confrontation or provoked this reaction." (ECF No. 13-1 at 44.) Thereafter, the state made the follow comments during its surrebuttal:

> First, of all, here's a man who's basically hanging out with an individual by the name of Elisa Pena. He's drinking beer. Where's the aggressiveness? They started trying to argue that this man was drunk, he was aggressive, he was brazen, he was in a bad mood. Where is that evidence? What he says is not evidence. The testimony that you do have is that nobody was drunk and aggressive buying beer that night according to Miss Lopez, and so did Jose Cotila say, hey, he was in a pretty good mood that day. He was kind of laughing and they were just discussing about getting an air conditioning repaired. So where is this aggressive, brazen attitude that the defense is trying to argue? It's just not there.

(ECF No. 13-1 at 48.)

It is true that the state is prohibited from using burden-shifting that relieves it of its burden of proving every element beyond a reasonable doubt. *See Sandstrom v. Montana*, 442 U.S. 510, 520-24 (1979); *see also In re Winship*, 397 U.S. 358, 364 (1970) (holding that "the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."). However, it cannot be determined that the foregoing comments made by the state amounted to burden-shifting. Judging this comment "in the context in which [it] was made," *Boyde v. California*, 494 U.S. 370, 385

17

(1990), it appears that the state was merely casting doubt on Alcaraz's trial counsel's closing argument by commenting that the evidence did not support the argument that Rodriguez was the initial aggressor. *See United States v. Lopez-Alvarez*, 970 F.2d 583, 597 (9th Cir. 1992) ("[T]he propriety of the prosecutor's remarks must be judged in relation to what would constitute a fair response to the remarks of defense counsel."). Indeed, in order to contradict Alcaraz's trial counsel's argument regarding Rodriguez's demeanor, the state then mentioned the testimony of Lopez and Cotila which showed the opposite: Rodriguez was happy and not drunk or aggressive. (*See* ECF No. 12-22 at 55 (Lopez's testimony that nobody at the Green Valley Grocery store where Rodriguez had been "was extremely aggressive or brazen" around "the short time period right before the 11:00 shooting") and ECF No. 12-24 at 11-12 (Cotila's testimony that Rodriguez was laughing and happy before the shooting, not drunk, aggressive, or agitated).) Thus, because the state's comment regarding the lack of evidence of Rodriguez's alleged hostile disposition on the night of the shooting was appropriate, Alcaraz's trial counsel was not deficient for not objecting. *Strickland*, 466 U.S. at 688.

And even if Alcaraz's trial counsel was deficient, Alcaraz fails to demonstrate prejudice. *Strickland*, 466 U.S. at 694. The jury was instructed that "the State [has] the burden of proving beyond a reasonable doubt every material element of the crime charged," that "the State must prove beyond a reasonable doubt that the defendant did not act in self-defense," and that "[s]tatements, arguments and opinions of counsel are not evidence." (ECF No. 13-2 at 23, 27, 29.) Because jurors are presumed to follow the instructions that they are given, *United States v. Olano*, 507 U.S. 725, 740 (1993), and because the jury was properly instructed about the burden of proof, Alcaraz falls short of demonstrating that the result of his trial would have been different had his trial counsel objected to a comment which allegedly shifted the burden of proof. Because Alcaraz's

ineffective-assistance-of-trial-counsel argument lacks merit, ground 1(4) is not substantial and is denied as being procedurally defaulted. *See Martinez*, 566 U.S. at 14.

### d. Ground 1(5)

In ground 1(5), Alcaraz alleges that his trial counsel failed to investigate and present evidence concerning Rodriguez's background and activities to support the argument that Rodriguez was the initial aggressor and a threat to him. (ECF No. 67 at 26.) Specifically, Alcaraz alleges that he told his trial counsel that Rodriguez was a drug dealer and was conducting illegal activities on the night of the shooting, but his trial counsel failed to investigate this information. (*Id.* at 27.) Alcaraz claims that this evidence could have explained why Rodriguez violently attacked him when he was merely headed to the convenience store. (*Id.*)

At the post-conviction evidentiary hearing held in 2011, Alcaraz's trial counsel testified that he tried to investigate whether Rodriguez had a gang affiliation or a violent history, but Rodriguez "was from Puerto Rico or Cuba, [so] there was just no record." (ECF No. 15-8 at 17.) Alcaraz's trial counsel also sought any NCIC records from the state regarding Rodriguez. (*Id.*) Because this investigation proved to be fruitless, in order "to be able to make an argument, or create the inference that [Rodriguez] was no stranger to the game and the situation," Alcaraz's trial counsel relied on "[t]he way [Rodriguez] presented; the tattoos on his body, the pistols on his stomach, the bullet holes tattooed in." (*Id.*) And although Alcaraz's trial counsel did not "recall anything specific about [Rodriguez] being in a gang," he explained that that fact "wouldn't have been nearly as important" as "his attitude relative to the situation." (*Id.*)

In a declaration prepared for this court in 2018, Alcaraz alleged that Rodriguez "was a known drug dealer and had sold the PCP that [he] had used earlier" the day of the shooting. (ECF No. 48-9 at 3.) Alcaraz "did not expect to run into [Rodriguez] at the store when [he] went to get

beer as that was not where [Rodriguez] usually sold his drugs." (*Id.*) Alcaraz explained that "[t]here had been a prior disagreement with . . . Rodriguez concerning drugs he was to have provided and [that] may have been the reason [Rodriguez] violently attacked [Alcaraz]." (*Id.*) Alcaraz "had provided this information to [his trial counsel] but to [Alcaraz's] knowledge [his trial counsel] did nothing to follow up on this information." (*Id.*)

Defense counsel has a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691. Additionally, "[i]n any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* This investigatory duty includes investigating the defendant's "most important defense" (*Sanders v. Ratelle*, 21 F.3d 1446, 1457 (9th Cir. 1994)), and investigating and introducing evidence that demonstrates factual innocence or evidence that raises sufficient doubt about the defendant's innocence. *Hart v. Gomez*, 174 F.3d 1067, 1070 (9th Cir. 1999). "[I]neffective assistance claims based on a duty to investigate must be considered in light of the strength of the government's case." *Eggleston v. United States*, 798 F.2d 374, 376 (9th Cir. 1986).

Alcaraz fails to demonstrate that his trial counsel acted deficiently in carrying out his investigative duties. *Strickland*, 466 U.S. at 688. Contrarily, Alcaraz's trial counsel testified that he attempted to research Rodriguez, but he was unable to do so because Rodriguez was from a different country and any records he may have had were inaccessible. This testimony about a lack of discoverable information about Rodriguez being a gang member was supported by Detective Wallace's trial testimony. Detective Wallace testified that he was "unable to obtain [Rodriguez's] records from Cuba," and that "[t]here was no indication in the research . . . that [Rodriguez] was ever a member of a criminal street gang." (ECF No. 13-1 at 20-21.) In fact, Detective Wallace

testified that Rodriguez was 47 years old and, from his "training, experience[,] . . . 47-year-old men" usually do not "hang out in gangs." (*Id.* at 19-20.) Thus, Alcaraz's trial counsel's investigation into Rodriguez was not objectively unreasonable. *Strickland*, 466 U.S. at 691. Further, beyond Alcaraz's self-serving declaration, which was prepared eleven years after his trial, he fails to present any evidence that he told his trial counsel that he had a drug-dealing relationship with Rodriguez prior to the shooting. *See, e.g., Womack v. Del Papa*, 497 F.3d 998, 1004 (9th Cir. 2007) (rejecting an ineffective-assistance-of-trial-counsel claim, in part, because "[o]ther than [the petitioner]'s own self-serving statement, there [was] no evidence that his attorney" acted the way the petitioner alleged).

And even if Alcaraz's trial counsel acted deficiently by not investigating the alleged relationship between Rodriguez and Alcaraz and the alleged fact that Rodriguez was a drug dealer, Alcaraz fails to demonstrate prejudice. *Strickland*, 466 U.S. at 694. First, there was already some evidence admitted at trial that Rodriguez may have been threatening, namely the fact that he was highly intoxicated and had various tattoos. (*See* ECF No. 12-23 at 40 (admission of photographs showing that the victim had tattoos on his chest) and (ECF No. 12-24 at 35 (testimony that Rodriguez had "an alcohol level at .21" at the time of the shooting).) Second, in addition to showing that Rodriguez was a drug dealer, this evidence would have also portrayed Alcaraz as a drug user who had a dispute with his dealer. This evidence could have been used by the state to argue that Alcaraz acted with premeditation. Third, this evidence would tend to contradict Alcaraz's own statements to law enforcement that he shot Rodriguez because he disrespected him and his neighborhood. (*See* ECF No. 13 at 70, 72.) Accordingly, because this alleged evidence that Alcaraz's trial counsel allegedly failed to investigate would have only supplemented the evidence already presented about Rodriguez's threatening demeanor, would have shown that Alcaraz

participated in criminal activity, and would have contradicted Alcaraz's previous statements, it is mere speculation that it would have changed the outcome of the trial. *See Djerf v. Ryan*, 931 F.3d 870, 881 (9th Cir. 2019) ("*Strickland* prejudice is not established by mere speculation.").

Because Alcaraz's ineffective-assistance-of-trial-counsel claim lacks merit, ground 1(5) is not substantial and is denied as being procedurally defaulted. *See Martinez*, 566 U.S. at 14.

### e.    Ground 1(6)

In ground 1(6), Alcaraz alleges that his trial counsel rushed through the proceedings, which, according to Alcaraz, is demonstrated by the fact that his entire trial lasted only two days. (ECF No. 67 at 28.) Alcaraz also notes two comments made by his trial counsel as proof that the proceedings were rushed. (*See id.* at 28-29.) First, after the state explained that it and Alcaraz had stipulated to the admission of a forensic laboratory report without calling the author of that report, Alcaraz's trial counsel stated, "[s]ee Judge, I'm already saving time." (ECF No. 12-23 at 41-42.) Second, following the reading of the verdict, outside the presence of the jury, the state district court indicated, "the verdict is what I thought the verdict should have been in this case." (ECF No. 13-1 at 60.) Alcaraz's trial counsel responded, "[s]hould have done a bench trial and saved us a day-and-a-half." (*Id.*)

Other than pointing to the foregoing innocuous comments, Alcaraz fails to present any evidence that his trial counsel improperly rushed through his trial. *See Jones v Gomez*, 66 F.3d 199, 205 (9th Cir. 1995) (denying habeas relief because the petitioner's "conclusory allegations did not meet the specificity requirement"); *James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). Rather, Alcaraz's trial counsel commented that the trial was short simply because there was not a lot of evidence to present. (*See* ECF No. 12-22 at 10 (comment by Alcaraz's trial

counsel before the trial commenced, outside the presence of the jury, that "[i]t's only going to be a breath between opening and closing anyway" because "we don't' have a whole lot of need for witnesses when the whole trial is on video").) And, importantly, Alcaraz's trial counsel advised the jury that they should not conclude that the quickness of the trial meant it was owed less attention. (*See* ECF No. 13-1 at 46 (closing argument comment by Alcaraz's trial counsel informing the jury of the following: "The last think I'm going to ask you to do is this was a relatively quick trial, defendant didn't have any witnesses. Don't let that fool you into thinking that your deliberation process needs to be quick as well").) Accordingly, because Alcaraz fails to demonstrate that his trial counsel was deficient, ground 1(6) is not substantial and is denied as being procedurally defaulted. *See Martinez*, 566 U.S. at 14.

### f.    Ground 1(7)

In ground 1(7), Alcaraz alleges that his trial counsel failed to file a motion to suppress his statements to law enforcement, arguing that they were taken while he was under the influence of PCP and alcohol. (ECF No. 67 at 29.) Similarly, Alcaraz alleges that his trial counsel failed to present evidence showing that he lacked the requisite mens rea for murder because of his impaired condition. (*Id.*) Alcaraz contends that if his trial counsel had presented evidence of his impaired condition or successfully gotten his confession suppressed, the jury would have found him guilty of a lesser offense. (*Id.* at 30.)

In a declaration prepared for this court eleven years after his trial took place, Alcaraz stated that he told his trial counsel "that at the time of the alleged incident [he] was under the influence of PCP (Sherm) and alcohol and did not have a clear recollection of all of the evidence." (ECF No. 48-9 at 2-3.) Alcaraz elaborated that "[a]fter [he] was arrested [he] only [could] recall bits and pieces of the conversations with the police officers," and that he "was drowsy and could not think

clearly." (*Id.* at 3.) Alcaraz "would also have visual hallucinations and paranoia after smoking sherm." (*Id.*)

First, regarding the motion to suppress his statement, the admission into evidence at trial of an involuntary statement violates a defendant's right to due process under the Fourteenth Amendment. *Lego v. Twomey*, 404 U.S. 477, 478 (1972); *Jackson v. Denno*, 378 U.S. 368, 376 (1964) ("It is now axiomatic that a defendant in a criminal case is deprived of due process of law if his conviction is founded, in whole or in part, upon an involuntary confession"); *see also Dickerson v. United States*, 530 U.S. 428, 444 (2000) (explaining that the requirement that *Miranda* rights be given prior to a custodial interrogation does not dispense with a due process inquiry into the voluntariness of a confession). However, "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). Therefore, although a defendant's mental state is a "significant factor in the 'voluntariness' calculus,'" it "does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional 'voluntariness.'" *Id.* at 164. Because Alcaraz fails to allege any police coercion, Alcaraz fails to establish a reasonable probability that his law enforcement interview would have been suppressed had his trial counsel moved for its suppression. *See Kimmelman v. Morrison,* 477 U.S. 365, 375 (1986) (explaining that in alleging that counsel failed to file a pretrial motion to suppress evidence, the petitioner must establish a reasonable probability that the evidence would have been suppressed and the outcome of the trial would have been different had the evidence been suppressed).[5]

---

[5] This court notes that Alcaraz's trial counsel did successfully move to redact portions of Alcaraz's law enforcement interview based on other grounds. (*See* ECF No. 12-22 at 16-19.)

Second, regarding his trial counsel's alleged failed to present evidence of his impaired condition, it is true that Nevada law allows "voluntary intoxication . . . [to] be considered in determining intent." *Andrade v. State*, 87 Nev. 144, 145, 483 P.2d 208, 208 (1971); *see also* Nev. Rev. Stat. § 193.220 ("No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his or her condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, the fact of the person's intoxication may be taken into consideration in determining the purpose, motive or intent."). Because Alcaraz was charged with open murder, his trial counsel was potentially deficient for not presenting evidence of his alleged[6] impaired condition at the time of the shooting to argue that, under Nevada law, he lacked the specific intent to kill to be convicted of first-degree murder. *Strickland*, 466 U.S. at 688; *see also Nevius v. State*, 101 Nev. 238, 249, 699 P.2d 1053, 1060 (1985) ("[V]oluntary intoxication may negate specific intent."); *see also Hancock v. State*, 80 Nev. 581, 583, 397 P.2d 181, 182 (1964) (explaining that first-degree murder requires the specific intent to kill). However, because Alcaraz was convicted of second-degree murder and because second-degree murder and voluntary manslaughter are both general intent crimes, Alcaraz fails to demonstrate prejudice. *Strickland*, 466 U.S. at 694; *see also Hancock*, 80 Nev. at 583, 397 P.2d at 182 (explaining that "a specific intent to kill need not be found" for second degree murder); *see also Curry v. State*, 106 Nev. 317, 319, 792 P.2d 396, 397 (1990) (explaining that "voluntary manslaughter is a general intent crime"). Because Alcaraz's ineffective-assistance-of-trial-counsel claim lacks merit, ground 1(7) is not substantial and is denied as being procedurally defaulted. *See Martinez*, 566 U.S. at 14.

---

[6] Alcaraz fails to present any evidence of his impaired state beyond his self-serving declaration.

## B.    Ground 4

In ground 4, Alcaraz alleges that his federal constitutional rights were violated when the state improperly commented that it would be a "freebie" to convict him of manslaughter. (ECF No. 67 at 31.) Alcaraz contends that this comment was an improper assertion of the state's personal opinion and improperly alluded to facts not in evidence. (ECF No. 80 at 13.) In affirming Alcaraz's convictions in his direct appeal, the Nevada Supreme Court held:

> Alcaraz next contends that the prosecutor committed misconduct during his rebuttal closing argument by suggesting that the defense's theory of voluntary manslaughter was "ridiculous and an insult to justice." The prosecutor stated that

>> The defense is trying to say that this is self defense. That it is not. He's now trying to argue that this was done as a manslaughter, and so he, during the opening statements, had been throwing out the buzz words for manslaughter, this impulsive reaction, this highly provoking injury. Where there is no sufficient time to deliberate your thought process, oh, no, this man, that's a freebie for him. This man knew what he was doing.

> Defense counsel objected to the statement and the district court sustained the objection.

> "'[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone.'" [Footnote 4: *Hernandez v. State*, 118 Nev. 513, 525, 50 P.3d 1100, 1108 (2002) (quoting *United States v. Young*, 470 U.S. 1, 11 (1985)).] Prosecutorial misconduct may constitute harmless error when there is overwhelming evidence of guilt and this court can determine that no prejudice resulted to the defendant. [Footnote 5: *See Pellegrini v. State*, 104 Nev. 625, 628-29, 764 P.2d 484, 487 (1988).] A prosecutor's remarks are prejudicial if they "so infected the proceedings with unfairness as to make the results a denial of due process." [Footnote 6: *Thomas v. State*, 120 Nev. 37, 47, 83 P.3d 818, 825 (2004) (citing *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).]

> In this case, we conclude that any alleged prosecutorial misconduct was not prejudicial. The State presented overwhelming evidence of Alcaraz's guilt, including a videotape of the murder. Additionally, the district court took appropriate curative measures immediately after the statement was made, sustaining defense counsel's objection and admonishing the prosecutor. Accordingly, reversal of Alcaraz's conviction is not warranted on the basis of prosecutorial misconduct.

(ECF No. 13-25 at 3-5.) The Nevada Supreme Court's rejection of Alcaraz's claim was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court.

As the Nevada Supreme Court accurately noted, the state made the following comment during its surrebuttal:

> The defense is trying to say that this is self defense. That it is not. He's now trying to argue that this was done as a manslaughter, and so he, during the opening statements, had been throwing out buzz words for manslaughter, this impulsive reaction, this highly provoking injury. Where there is no sufficient time to deliberate your thought process, oh, no, this man, that's a freebie for him. This man knew what he was doing. He clearly was thinking of what he was about to --."

(ECF No. 13-1 at 50-51.) Alcaraz's trial counsel "object[ed] to the reference that manslaughter or second degree murder being a freebie." (*Id.* at 51.) The state clarified its statement, explaining, "[w]ell a verdict for manslaughter is a freebie for him." (*Id.*) Alcaraz's trial counsel objected again, and the state district court sustained the objection, instructing the state that it "can say that it doesn't match the conduct." (*Id.*)

"[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." *Smith v. Phillips*, 455 U.S. 209, 219 (1982). "The relevant question is whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see also Brown v. Borg*, 951 F.2d 1011, 1017 (9th Cir. 1991) ("Improprieties in closing arguments can, themselves, violate due process."). "[P]rosecutorial misconduct[ ] warrant[s] relief only if [it] 'had substantial and injurious effect or influence in determining the jury's verdict.'" *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993)).

The Nevada Supreme Court reasonably concluded that any alleged prosecutorial misconduct stemming from the state's "freebie" comment did not warrant the granting of relief. As the Nevada Supreme Court reasonably noted, there was substantial evidence of Alcaraz's guilt, particularly the surveillance videotape which showcased Alcaraz shooting Rodriguez seven times. *See Tan v. Runnels*, 413 F.3d 1101, 1115 (9th Cir. 2005) (explaining that the fairness of a trial is measured, in part, by "the weight of the evidence against the accused"). Moreover, the jury was instructed that "[s]tatements, arguments and opinions of counsel are not evidence in the case." (ECF No. 13-2 at 29). As such, it cannot be concluded that this isolated comment—even if it amounted to misconduct—constituted a due process violation. *Darden*, 477 U.S. at 181; *see also Allen v. Woodford*, 395 F.3d 979, 998 (9th Cir. 2005) (finding that prosecutorial misconduct did not amount to a due process violation where the trial court gave an instruction that the attorneys' statements were not evidence and where the prosecutors presented substantial evidence of the defendant's guilt); *see also Sassounian v. Roe*, 230 F.3d 1097, 1107 (9th Cir. 2000) (determining, in part, that the petitioner was not denied a fair trial due to prosecutorial misconduct because "the misconduct was isolated"). Alcaraz is denied federal habeas relief for ground 4.

## C.    Ground 7

In ground 7, Alcaraz alleges that his federal constitutional rights were violated due to the cumulative errors discussed in his petition. (ECF No. 67 at 42.) Cumulative error applies where, "although no single trial error examined in isolation is sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still prejudice a defendant." *United States v. Frederick*, 78 F.3d 1370, 1381 (9th Cir. 1996); *see also Parle v. Runnels*, 387 F.3d 1030, 1045 (9th Cir. 2004) (explaining that the court must assess whether the aggregated errors "'so infected the trial with unfairness as to make the resulting conviction a denial of due process'" (citing

*Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). This court has not identified any definite errors in Alcaraz's remaining procedurally viable claims, so there are no errors to cumulate. Alcaraz is denied federal habeas relief for ground 7.[7]

## IV. CERTIFICATE OF APPEALABILITY

This is a final order adverse to Alcaraz. Rule 11 of the Rules Governing Section 2254 Cases requires this court issue or deny a certificate of appealability (COA). As such, this court has *sua sponte* evaluated the remaining claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864-65 (9th Cir. 2002). Pursuant to 28 U.S.C. § 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id*. Applying these standards, this court finds that a certificate of appealability is unwarranted.

---

[7] Alcaraz requests that this court "[c]onduct an evidentiary hearing at which proof may be offered concerning the allegations in [his] amended petition and any defenses that may be raised by respondents." (ECF No. 67 at 44.) Alcaraz fails to explain what evidence would be presented at an evidentiary hearing, especially since a thorough evidentiary hearing was held before the state district court regarding ground 1(1). Moreover, this court has already determined that Alcaraz is not entitled to relief, and neither further factual development nor any evidence that may be proffered at an evidentiary hearing would affect this court's reasons for denying relief. Accordingly, Alcaraz's request for an evidentiary hearing is denied.

**V.     CONCLUSION**

In accordance with the foregoing, **IT IS THEREFORE ORDERED**:

    1.     The second amended petition (ECF No. 67) is DENIED.

    2.     A certificate of appealability is DENIED.

    3.     The clerk of the court is directed to enter judgment accordingly.

Dated:  May 24, 2021.

JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE